UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JAMES GRAHAM, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Cause No. 1:17-cv-1742-WTL-MPB |
| | ) | |
| ARCTIC ZONE ICEPLEX, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## ENTRY ON MOTION FOR SUMMARY JUDGMENT

This cause is before the Court on the motion for summary judgment filed by Defendant Arctic Zone Iceplex, LLC (Dkt. No. 33). The motion is fully briefed and the Court, being duly advised, **GRANTS IN PART** the Defendant's motion.

### I. STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed, and all reasonable inferences must be drawn in the non-movant's favor. *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor."). However, a party who bears the burden of proof on a particular issue may not rest on its pleadings, but must show what evidence it has that there is a genuine issue of material fact that requires trial. *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court is not required to scour the record in

search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001).

## II.    FACTUAL BACKGROUND

The facts of record, viewed in the light most favorable to the Plaintiff, the non-moving party, are as follow.

On or around December 15, 2014, the Plaintiff was hired by the Defendant at its ice skating and hockey rink. The Plaintiff was an hourly maintenance worker whose job duties included performing general maintenance of the ice rink facilities and operating the Zamboni machine, an ice resurfacer used to clean and smooth the ice rink.  When he was hired, the Plaintiff was told that he could work either days or evenings depending on the season.  During hockey season (fall and winter) most maintenance work takes place during the evenings.  The Defendant received two customer complaints concerning the Plaintiff during the early stages of the Plaintiff's employment.

On February 13, 2015, the Plaintiff fell off a ladder while attempting to repair an HVAC unit.  The Plaintiff was diagnosed with a broken finger, a broken nose, and a concussion.  After his concussion diagnosis, the Plaintiff was given a "no work status" restriction.  The Plaintiff was off work from February 13, 2015, to May 13, 2015, and he applied for and received workers' compensation benefits during this time.

On May 13, 2015, the Plaintiff was released to work with restrictions, including requirements that he not drive and that he sit while working.  These restrictions of no driving and performing only sitting/sedentary work remained from May 13, 2015, until August 12, 2015.  During this time, the Plaintiff's physician restricted him to working only eight hours per week,

and the parties complied with this restriction. The Plaintiff never worked more than twenty hours in a week until he was released to full duty.

To accommodate the Plaintiff's medical restrictions that were in place from May 13, 2015, to August 12, 2015, the Defendant assigned the Plaintiff to skate sharpening. The Plaintiff alleges that this position did not comply with his restrictions because it could not be done while sitting and that "the few times [he] got caught sitting and resting [he] was told to get back to work." Dkt. No. 33-2 at 7. According to the Defendant, the Plaintiff complained about this new role, but never expressed to the Defendant that he was unable to sit while sharpening skates or that he thought this was an unsuitable accommodation. The Plaintiff explains that he believed that complaining would risk his employment and contends that the Defendant knew that skate sharpening was a standing job.

On August 12, 2015, the Plaintiff was released to work without driving and sedentary work restrictions. Dr. Larry Lett, the Plaintiff's treating physician, also placed the Plaintiff on a reduced work schedule over a three-week period pursuant to which the Plaintiff would work a four-hour workday the first week, a six-hour workday the following two weeks, and then would be released to full-time without any restrictions on September 16, 2015. The Plaintiff was scheduled to work evenings upon his return. The Plaintiff characterizes this as a demotion to night mechanic, while the Defendant asserts that he was assigned to work evening hours due to the busy season.

On October 15, 2015, one month after he was released to work without restrictions, the Plaintiff drove the Zamboni into the ice rink wall, causing jagged plastic to protrude from the wall. Following the accident, the Defendant believed the Plaintiff displayed a disregard for customer safety when he allowed skaters back onto the rink without removing or fixing the

jagged piece of plastic that was sticking out from the ice rink wall.  According to the Plaintiff's termination letter, the Plaintiff was subsequently terminated for: (1) "[p]oor attitude regarding a change of position"; (2) "[p]oor attitude toward customers"; (3) "[t]he inability [to] perform his job tasks in a timely manner"; (4) "[i]nsubordinate to Ownership and upper management when questioned on several matters"; and (5) "[f]ailed to drive the Zamboni properly on 10-15-15 causing damage to walls and the machine itself."  Dkt. No. 33-6.  The Plaintiff's position in maintenance was never filled.

## III. DISCUSSION

The Plaintiff alleges that the Defendant discriminated against him on the basis of a disability in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and retaliated against him for seeking worker's compensation benefits, in violation of *Frampton v. Central Indiana Gas Co.*, 297 N.E. 2d 425 (Ind. 1973).

> Discrimination under the ADA has two different meanings.
>
> First, it means treating "a qualified individual with a disability" differently because of the disability, i.e., disparate treatment. . . .  Additionally, because the ADA defines discrimination in part as "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual," a separate claim of discrimination can be stated under the ADA for failing to provide a reasonable accommodation.

*Sieberns v. Wal-Mart Stores, Inc.*, 125 F.3d 1019, 1021- 22 (7th Cir. 1997).  Following the Seventh Circuit's decision in *Ortiz v. Werner Enters., Inc.*, a disability discrimination claim will survive summary judgment if a reasonable jury, considering the facts of record in the light most favorable to the Plaintiff, could conclude that discrimination was the reason for the adverse action.  *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764 (7th Cir. 2016).   In a failure to accommodate claim, the Plaintiff must show that his employer was aware of his disability and

4

still failed to reasonably accommodate it. *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 572 (7th Cir. 2001).

A. **Disparate Treatment**

A claim for disparate treatment requires that there be an adverse action and that the reason for the adverse action was discrimination. *Ortiz*, 834 F.3d at 764. Additionally, the Plaintiff must have a disability as defined by the ADA, which the Court will assume for the purposes of this ruling. There is no dispute that the Plaintiff's termination was an adverse action.[1]

However, there is insufficient evidence from which a reasonable jury could find that discrimination based on the Plaintiff's disability was the cause of his termination. The Plaintiff argues that the reasons provided for his termination are inaccurate, but this is insufficient. "Pretext involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is a lie, specifically a phony reason for some action." *Monroe v. Indiana Dep't of Transp.*, 871 F.3d 495, 505 (7th Cir. 2017) (internal quotation marks and alterations omitted). Therefore, "[i]n determining whether an employer's stated reason for discharge is pretextual, the question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain the discharge." *Id.* (internal quotation marks and alterations omitted). The Plaintiff disputes the reasons provided for his termination in his termination letter; however, none of his arguments or evidence suggests that the Defendant did not honestly believe the reasons it offered.

---

[1] The Plaintiff does not argue that his demotion constituted an adverse action for the purposes of his disparate treatment claim.

First, the Plaintiff argues that his alleged "[p]oor attitude regarding a change of position" was pretextual. Dkt. No. 35 at 11. In support of this argument, the Plaintiff notes that "[i]n his deposition [Floyd] Johnson [(the Plaintiff's supervisor)] testified that [the Plaintiff] was not moved to a new position after his injury" and that "the inconsistencies between Johnson's statement on the termination notice and his statements under oath . . . lead to a belief that Johnson is being dishonest and his stated reasons for termination are pretext." *Id*. However, the Plaintiff admits that "[o]f course [he] was not happy about losing his position as head mechanic in retaliation for his work injury." *Id*. Rather than providing a reason to disbelieve the Defendant's reasoning in the termination letter, the Plaintiff's own argument supports the Defendant's assertion.

Second, the Plaintiff argues that the Defendant's assertion that he had a "[p]oor attitude towards customers" is pretextual. According to the Plaintiff:

> [The Plaintiff] did not have any formal discipline or write ups at the time of his termination. [The Plaintiff] was never disciplined for any issues with customers. In his deposition Johnson explained that he did not give formal discipline for minor offenses. (Def.'s Exhibit A, pg. 26, p. 9-18). [The Plaintiff] never received formal discipline concerning any customer complaints. Johnson testified that one of the customers who complained about [the Plaintiff] is a difficult customer and other employees have had issues with this customer as well. (Def.'s Exhibit A, pg. 40, p. 6-16). Johnson testified that the other customer complaints that Item 2 refers to were concerning a personal issue related to [the Plaintiff's] family member and Johnson told him "doesn't matter" but you have to separate personal and work. (Def.'s Exhibit A, pg. 41, p. 1-13). Johnson testified that neither of these incidents was severe enough to warrant a write-up at the time. (Def.'s Exhibit A, pg. 42, p 1-2). Prior to [the Plaintiff's] injury Johnson did not find these customer complaints to be serious enough to warrant formal discipline and it was not until after [the Plaintiff] was injured and received worker's compensation that Johnson determined these customer complaints were severe enough to include as justification for his termination. If these interactions with the customers were not severe enough to warrant any discipline at the time they occurred then presumably they are not severe enough to lead to termination and were not the actual basis of any decision to terminate; therefore, Item 2 is also pretext.

Dkt. No. 35 at 12.  The problem with the Plaintiff's argument is that both parties acknowledge that these events occurred, and there is nothing to suggest that, although they did not result in formal discipline at the time, they did not factor into the Defendant's decision to terminate the Plaintiff.  In other words, there is nothing to suggest "that the employer's proffered reason[] [was] factually baseless."  *Tibbs v. Admin. Office of the Illinois Courts*, 860 F.3d 502, 506 (7th Cir. 2017).

The third reason provided by the Defendant for the Plaintiff's termination was his "inability [sic] perform his job tasks in a timely manner."  Dkt. No. 33-6 at 1.  The Plaintiff argues that this reason is pretextual because:

> [The Plaintiff] was never written up or counseled for failing to perform his job tasks in a timely manner. (Def.'s Exhibit B, pg. 43, p. 20-23). Johnson testified that he did not formally discipline for any acts he considered to be "little minor offenses." (Def.'s Exhibit A, pg. 26, p. 11-12).  Therefore, the fact that [the Plaintiff] was never disciplined or even told that there was any issue with him performing his job in a timely manner, suggests that [the Defendant] only considered any alleged issue with timeliness to be minor.  Presumably [the Plaintiff] was not terminated for something that [the Defendant] considered to be a minor offense at the time it was occurring.  Johnson testified that [the Plaintiff] consistently failed to make ice on time both before and after his injury, but it wasn't affecting [the Defendant] prior to [the Plaintiff's] injury when he was working during the daytime. (Def.'s Exhibit A, pg. 44, p. 2-18).  As discussed under Item 1, [the Plaintiff] was only moved to night shift after his injury in retaliation and due to the fact that [the Defendant] had hired a replacement for him; therefore, but for [the Plaintiff's] injury he would not be making ice in the evening and any timeliness issues would not have been a factor.  Additionally, there is a factual dispute as to whether or not this is even an issue because [the Plaintiff] testified he was not told he had an issue making ice on time. (Def.'s Exhibit B, pg. 43, p. 20-22).  Given the previous inconsistencies in Johnson's testimony there is a genuine issue of fact as to whether or not [the Plaintiff] had an issue making ice timely and the trier of fact should be permitted to weigh Johnson's credibility.

Dkt. No. 35 at 12-13.  Unfortunately for the Plaintiff, the fact that the Defendant "only considered any alleged issue with timeliness to be minor" does not mean that it was not a contributing factor in his termination.  Furthermore, while the Plaintiff contends that he should

7

not have been switched to the night shift, the contested nature of that shift change does not negate the fact that his response to the change and his work performance following it contributed to his termination.

The Plaintiff makes similar arguments with regard to the fourth reason provided for his termination, that he was "[i]nsubordinate to Ownership and upper management when questioned on several matters." Dkt. No. 33-6 at 1. This refers to the Plaintiff's response to the "demotion," which he says should not have occurred, but again, Plaintiff's claim regarding the demotion does not establish that the proffered reason itself is pretextual. Likewise, the fact that "[the Plaintiff's] questioning of his demotion and change in position was not rude enough for [the Defendant] to write [the Plaintiff] up or discipline him at the time," Dkt. No. 35 at 14, does not mean that it did not factor into the Defendant's termination decision.

Finally, the Defendant cites the Zamboni accident on October 15, 2015, as the final reason for his termination. The Plaintiff argues that Johnson "intentionally misled and inflated the damage caused by [the Plaintiff] in his description of the accident," and notes that another employer, Geoff Heavner, was not terminated after he crashed the Zamboni on another occasion. Dkt. No. 35 at 14. The Defendant, however, notes that the letter "was created on the night that the Zamboni incident occurred when the full extent of the damage caused by Plaintiff was not yet known" and that "[a]t the time, [the Defendant] believed that the rink would have to be shut down." Dkt. No. 36 at 9. The Defendant also notes that the Heavner incident is distinguishable because the Defendant's customers were not endangered by the incident. Dkt. No. 35 at 10-11.

The Plaintiff asserts that the jagged plastic did not create an unsafe situation,[2] but provides no evidence that would support a finding that the Defendant did not believe that it was unsafe.

In sum, while the Plaintiff may contest the proffered reasons, "[m]erely disagreeing with an employer's reasons does not [establish pretext]." *Tibbs v. Admin. Office of the Illinois Courts*, 860 F.3d 502, 506 (7th Cir. 2017). Furthermore, "[w]here multiple reasons are given, as in this case, the [P]laintiff faces a greater challenge." *Id*. Here the Plaintiff has not met this challenge, because pretext alone, without "some reason to infer that [discrimination] *was* the reason," is insufficient to survive summary judgment. *King v. Ford Motor Co.*, 872 F.3d 833, 842 (7th Cir. 2017) (post-*Ortiz*) (emphasis in original); *see also Teruggi v. CIT Grp./Capital Fin., Inc.*, 709 F.3d 654, 661 (7th Cir. 2013) (stating, pre-*Ortiz*, that "[e]ven if [the plaintiff's] evidence showed pretext, that alone would not be sufficient to survive summary judgment"); *Van Antwerp v. City of Peoria, Ill.*, 627 F.3d 295-298-99 (7th Cir. 2010) (holding, pre-*Ortiz*, that even if the plaintiff had provided evidence of pretext, the plaintiff's claim would still fail without "some minimal showing that the 'real reason'" for the decision was discrimination).

### B. Failure to Accommodate

"The ADA requires employers to make reasonable accommodations that will allow a qualified individual with a disability to perform the essential functions of his or her job." *Brown v. Milwaukee Bd. of Sch. Directors*, 855 F.3d 818, 820 (7th Cir. 2017) (citations omitted). The

---

[2] The Plaintiff argues that "it is questionable as to how jagged and dangerous this piece of plastic actually was" because "Aulby testified that he had kept the piece of plastic but now conveniently cannot find this dangerous piece of plastic." Dkt. No. 35 at 17. However, the Plaintiff does not argue that he is entitled to an adverse inference because of the Defendant's failure to retain the piece of plastic, and, regardless, the question is not whether the Zamboni created a safety hazard, but rather whether the Defendant believed that it did.

Plaintiff alleges that the Defendant failed to accommodate (1) his need for a modified schedule

and (2) his sedentary work requirement.

> With regard to the modified work schedule, the Plaintiff argues:
>
>> It is a material issue of fact as to whether or not [the Plaintiff] was also under restrictions related to working a modified work schedule that included reduced hours. Specifically, the medical records indicate that [the Plaintiff] was only working a part-time schedule, specifically, four (4) hours a day two (2) days a week. (Exhibit 1). This reduced work schedule was acknowledged in the medical records. (Exhibit 1, Def.'s Exhibit C, pg. 9). This reduced work schedule was acknowledged by the nurse case manager. (Exhibit 5). [The Plaintiff's] reduced work schedule was also acknowledged by the worker's compensation carrier as evidenced by their payment of temporary partial disability (TPD) benefits. (Exhibit 2, pg. 8). The carrier paid [the Plaintiff] TPD payments to supplement his income as required under the worker's compensation statute when an employee cannot work a full time work schedule due to their injury. I.C. 22-3-3-7. The TPD payments indicate that the employer, nurse case manager and insurance carrier were in agreement that [the Plaintiff] was not expected to work a full time schedule and they were therefore, supplementing his income until he could be released to return to full time employment. [The Defendant] now attempts to argue that there was no requirement for [the Plaintiff] to work a reduced schedule in relation to his restrictions but this is inconsistent with the evidence. Dr. Lett treated [the Plaintiff] during his worker's compensation claim and he testified that he does not recall giving [the Plaintiff] any specific hourly restrictions, but it is Dr. Lett who eased [the Plaintiff] back into full time employment upon his release. (Def.'s Exhibit C, pg. 9). Dr. Lett acknowledges that [the Plaintiff] was attending two different types of rehabilitation multiple times a week during the time that he was working a reduced schedule. (Def.'s Exhibit D, pg. 37-38). Dr. Lett also acknowledges that there was probably a discussion with [the Plaintiff] indicating that he could work as much as he felt he could. (Def.'s Exhibit D, pg. 41-42). It is now an issue of fact as to whether or not [the Plaintiff] was under any type of modified work schedule and if he was whether or not [the Defendant] properly accommodated that modified work schedule. There is conflicting evidence and testimony with regard to whether or not [the Plaintiff] was working a modified work schedule as an accommodation for his disability or whether he was working reduced hours by his own accord as [the Defendant] now suggests; due to the conflicting evidence on this matter it should be left to the trier of fact to review the evidence and determine.

Dkt. No. 35 at 27-28. The Plaintiff seems to be suggesting that the Defendant failed to

accommodate his need for a modified work schedule; however, he states that after his injury,

> [the Plaintiff] was given a no work status restriction and he was off of work from February 13, 2015 - May 13, 2015. (Def.'s Exhibit C). On May 13, 2015, [the Plaintiff] was released to return to work with restrictions and he returned working a reduced/modified schedule. (Def.'s Exhibit E, pg. 34, p.12-20). [The Plaintiff] continued to receive partial disability payments through worker's compensation due to his reduced work hour schedule. (Exhibit 2, pg. 8). It is [the Plaintiff's] understanding that he was working a reduced schedule of eight (8) hours a day two days a week. (Def.'s Exhibit B, pg. 55-56, Exhibit 3). [The Plaintiff] never worked more than twenty (20) hours from May 13, 2015 until he was released to full duty, [the Plaintiff] received partial disability through worker's compensation to compensate him for the fact he was not yet working a full time schedule, and [the Plaintiff] was not written up or disciplined for attendance during the entirety of his employment. (Exhibit 2, pg. 6-7). On August 12, 2015, Dr. Lett, who was treating [the Plaintiff], noted that he continued to work his reduced schedule of four (4) hours a day two (2) days a week but that he was ready to ease [the Plaintiff] back into a full time schedule by increasing his hours weekly. (Exhibit 3). [The Defendant] did not cite [the Plaintiff's] reduced schedule or attendance as an issue leading to his termination. (Def.'s Exhibit F). Johnson in his deposition stated that when [the Plaintiff] returned, "he had to stay seated. He could only work so many hours." (Def.'s Exhibit A, pg. 63, p. 20). Johnson never said that [the Plaintiff] was scheduled for full time work, the only thing Johnson stated was that [the Plaintiff] did miss several days due to issues related to his concussion. (Def.'s Exhibit A, pg. 63-64). [The Plaintiff] was also undergoing therapy multiple days a week during this time period. (Def.'s Exhibit D, pg. 37-39, Exhibit 3).

Dkt. No. 35 at 2-3. The Plaintiff's own description makes it clear that the Defendant did accommodate his need for a modified work schedule. Because he points to no evidence to suggest that he required a work schedule other than the one he was provided, this claim cannot survive summary judgment.

With regard to the sedentary work requirement,[3] both parties agree that the Defendant assigned the Plaintiff to skate sharpening duties, but they dispute whether skate sharpening requires standing. The Plaintiff, citing his own testimony, argues that the Defendant knew that skate sharpening was not sedentary work, but the cited testimony only shows that the "few times that [he] got caught sitting and resting [he] was told to get back to work." Dkt. No. 33-2 at 7.

---

[3] The Plaintiff does not argue that he needed any accommodation beyond those required by the restrictions established by Dr. Lett.

The Plaintiff does not specify who told him to get back to work, or whether he was even working, by sharpening skates while seated, when he was told to get back to work.

Furthermore, "an employer is not obligated to accommodate an employee's disability until the employee informs the employer of the existence of the disability and requests an accommodation." *Guzman v. Brown Cnty.*, 884 F.3d 633, 642 (7th Cir. 2018). Here, however, the Plaintiff "did not complain to [the Defendant] that the skate sharpening job was outside of his restrictions because 'he was happy to be working' and because the few times that he was 'caught sitting down to rest he was told to get back to work.'" Dkt. No. 35 at 3. Thus there is no evidence to suggest that the Defendant was aware of the need for further accommodation. "[I]dentifying reasonable accommodations for a disabled employee requires both employer and employee to engage in a flexible, interactive process. Both parties are responsible for that process." *Brown*, 855 F.3d at 821. The Plaintiff provides no evidence that suggests that the Defendant knew that he felt he was not being allowed to sit on the job or that the Defendant knew he considered skate sharpening to be outside his work restrictions. In other words, the Plaintiff failed to uphold his end of the "interactive process," *Brown*, 855 F.3d at 821, and the Defendant cannot be held liable for its failure to address a problem of which it was not made aware.

The ADA claim is the only federal claim in this case; however, the Defendant has also moved for summary judgment on the Plaintiff's *Frampton* claim, which is premised on state law. The Court's jurisdiction over the *Frampton* claim is based on 28 U.S.C. § 1367, which provides for the exercise of supplemental jurisdiction over claims based on state law that are closely related to the federal claims in a case. Dkt. No. 1 at 2. "When all federal claims in a suit in federal court are dismissed before trial, the presumption is that the court will relinquish federal

jurisdiction over any supplemental state-law claims." *RWJ Mgmt. Co. v. BP Products N. Am., Inc.*, 672 F.3d 476, 479 (7th Cir. 2012) (citation omitted). "The presumption is rebuttable, but it should not be lightly abandoned, as it is based on a legitimate and substantial concern with minimizing federal intrusion into areas of purely state law." *Id.* (citations and internal quotation marks omitted). The Seventh Circuit has

> identified certain circumstances that may displace the presumption, namely: (1) the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court; (2) substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort; or (3) when it is absolutely clear how the pendent claims can be decided.

*Id.* at 480 (citation omitted). None of those exceptions apply here. Accordingly, the Court declines to exercise supplemental jurisdiction over the Plaintiff's state law claim.

## IV. CONCLUSION

For the reasons set forth above, the Defendant's motion for summary judgment, Dkt. No. 33, is **GRANTED IN PART** and summary judgment is entered in favor of the Defendant on the Plaintiff's ADA claim. The Plaintiff's remaining *Frampton* claim is **DISMISSED WITHOUT PREJUDICE**.

SO ORDERED: 10/25/18

Hon. William T. Lawrence, Senior Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic notification